

**IN THE COURT OF CRIMINAL APPEALS
OF TEXAS**

### NO. WR-77,175-05

### EX PARTE RANDY ETHAN HALPRIN, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. W01-00327-T(B) IN THE 283RD DISTRICT COURT
### FROM DALLAS COUNTY

RICHARDSON, J., filed a concurring opinion in which NEWELL and WALKER, JJ., joined.

## CONCURRING OPINION

"Because I'm going to get them all the death penalty . . . ."[1] One would imagine this came from a zealous prosecutor while pursuing justice. But instead, it was the supposedly neutral trial judge who stated this after being appointed to preside over the capital murder trials of several defendants. A constitutionally mandated impartial judge did not exist here.

---

[1] (2B RR 64).

1

Among the defendants was Randy Halprin, whom the judge would later refer to in a derogatory way as "Randy the Jew" and "the Jew Halprin."[2] While it is true that statements attributable to the trial judge referred to herein were not made during trial or known to the defense prior to trial, the testimony at the habeas hearing is at least disturbing. And because they were not made public until after the conviction, a motion to recuse was not filed. During the trial, the judge referred to Applicant as "the Jew." These words were said outside of the courtroom.

The judge's antisemitism was of no fleeting moment. "F##king Jew." "Filthy Jews." "Goddamn K#kes."[3] These are some of the views the judge espoused while a member of the bar and while being entrusted as a judge. It was only after being convicted, that Applicant discovered that an antisemitic and racist judge presided over his case. Halprin brings a federal due process challenge to his conviction, which leads us to the question: Does the Federal Constitution guarantee of due process tolerate an antisemitic and racist judge presiding over the death penalty trial of a Jewish defendant?

Today, this Court answers "NO." According to the Applicant, the habeas judge,[4] and even the Tarrant County District Attorney's Office representing the State,[5] the trial

---

[2] (2C RR 110-11).

[3] (2C RR 58, 59-60).

[4] Findings of Fact and Conclusions of Law on Application for Writ of Habeas Corpus, at *42 (filed Oct. 11, 2021).

[5] (10-03-2022 Supp. CR 208-59) ("State's Post-Hearing Proposed Memorandum, Findings of Fact, and Conclusions of Law") [hereinafter State's Proposed Findings]. The State was

2

judge in this case crossed the line. All parties agree that a new trial is warranted. The conviction violates the ethos[6] of the Constitution and threatens the legitimacy of our justice system by undermining impartiality in both appearance and actuality. [7] "[S]uch discrimination not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government."[8] Allowing such a conviction to stand would mock the concept of "fundamental fairness," destroy the credibility of the judiciary, and delegitimize the justice system. As noted in an *amicus* brief received by the Court signed by over 100 Jewish attorneys:

> Amici Lawyers are members of the State Bar of Texas. Many of us are litigators, who regularly appear before the judges of the State. We routinely tell our clients—a cross section of the culturally diverse population of Texas—that the judges who decide their cases will do their best to judge impartially, without regard to race, national origin, gender, or religion. In our experience, judges overwhelmingly strive to and do just that. But where, as here, the judge is a bigot (no polite euphemism will do), the judicial system must purge itself of the resulting vestige of bias that undermines public confidence in the integrity and impartiality of our judiciary.[9]

---

represented by then-Tarrant County District Attorney Sharen Wilson and her office after the Dallas County District Attorney was recused from the case. (1-29-2024 Supp. CR 136).

[6] Professor Philip Bobbitt developed the idea of "modalities" for constitutional argument. His list consists of text, structure, prudence, history, precent, and ethos. *See e.g.* Paul Brest, Sanford Levinson, Jack M. Balkin, Akhil Reed Amar, Reva B. Siegel*, Processes of Constitutional Decisionmaking,* 55–62 (7th Edition); Philip Bobbitt, *Constitutional Fate: Theory of the Constitution* (1982).

[7] "Racial bias is structural error because it is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice.'" *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017).

[8] *Rose v. Mitchell*, 443 U.S. 545, 556 (1979) (internal quotes omitted).

[9] Br. of Prominent Jewish Members of the State Bar of Texas, et al., as Amici Curiae in Support of Randy Halprin's Application, at *3 [hereinafter *Amici*].

Thus, such a violation is constitutionally intolerable.

## I.    Background

In 2000, Randy Halprin escaped from prison with six other inmates. They came to be known as the "Texas Seven."[10] Before they were captured, they murdered Irving Police Officer Aubrey Hawkins while committing robbery with several customers at a store. The State charged Halprin with capital murder and sought the death penalty.

Dallas District Judge Vickers Cunningham presided over the case. But unknown to the State and defense at the time, he was demonstrably antisemitic and racist during the case. The jury convicted Randy Halprin and sentenced him to death in 2003.

In 2018, Judge Cunningham ran for Dallas County Commissioner. The *Dallas Morning News* published an article detailing the 2010 creation of an irrevocable living trust for his children that provided a greater financial reward if the children married a white Christian of the opposite sex. This information ultimately led Halprin to file the instant writ.

At the habeas evidentiary hearing, both parties adduced statements and conduct by the trial judge supporting the claim he was actually biased against Applicant for being Jewish. Many of these statements and incidents were corroborated by and consistent with the testimony of other witnesses. Halprin's trial counsel testified that had he known of these

---

[10] Six of the seven were successfully captured in Colorado. One committed suicide prior to capture. Four have since been executed.

statements, he would have moved to recuse the judge.[11] Only a portion of what was uncovered and testified to are attached hereto as an exhibit.[12]

---

[11] The trial judge in this case failed to adhere to Texas Rule of Civil Procedure 18b (b) which applies to all judges overseeing criminal cases:

(b) *Grounds for Recusal.* A judge must recuse in any proceeding in which:
(1) the judge's impartiality might reasonably be questioned;
(2) the judge has a personal bias or prejudice concerning the subject matter or party; . . . .

The trial judge also failed to conform to the Texas Code of Judicial Conduct which mandates in relevant part:

Canon 1: Upholding the Integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective.

Canon 2: Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities

A. A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
***
C. A judge shall not knowingly hold membership in any organization that practices discrimination prohibited by law.

Canon 3: Performing the Duties of Judicial Office Impartially and Diligently

B. Adjudicative Responsibilities.

(5) A judge shall perform judicial duties without bias or prejudice.

(6) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.

[12] *See* Exhibit 1.

5

The record further reflects that Judge Cunningham believed it was his "destiny" to become a judge and sentence the Texas Seven to death on his way to becoming the Dallas County District Attorney—his long-term goal.[13] After the trials of the Texas Seven, Judge Cunningham resigned from the bench in 2005 to unsuccessfully run for Dallas District Attorney. Evidence adduced by the parties in the habeas record shows that Halprin's trial judge "took special pride in the death sentences because they included Latinos and a Jew" and personally viewed them as "his greatest achievement in life."[14] His campaign tagline was "I looked each man in the eye as I sentenced him to die."[15] The evidentiary hearing also exposed testimony about his stated career plans: "when he was district attorney, he was gonna bring back Henry Wade-style justice and he was gonna get the n#gg#rs and the w#tb#cks under control."[16] The evidentiary hearing adduced evidence including expert

---

[13] Exh. 8; (2C RR 26-27)

[14] (10-03-2022 Supp. CR 172).

He just took so much pleasure that six of the seven guys were going to die on death row in Texas. And, you know, that was the whole tagline for the TV commercial, and it was just cringe worthy. But to go to events with him and he would, you know, say, I looked each man in the eye as I sentenced them to die, it was just this cringy, ridiculous, bragging, grand – I mean, just grandiose and bragging about it, and it was really off-putting.

(2C RR 115).

[15] (2C RR 115).

[16] (2B RR 109-10). The record reflects that Cunningham was a "big fan" of former Dallas County District Attorney Henry Wade because "when Henry Wade was District Attorney . . . all the n#gg#rs and w#tb#cks knew their place . . . ." (2B RR 109); *see also* (2C RR 65) ("He had to save Dallas County from the n#gg#rs and the w#tb#cks and the Jews . . . ."). "[Cunningham] believes on some level all black people have done something that warrants putting them in jail."

6

testimony that the trial judge's life-long hatred against Jews, Blacks,[17] Latinos,[18] and Catholics[19] were intrinsic to his worldview, and that it would be virtually impossible for Judge Cunningham to set aside those biases during the trial of a Jew accused of killing a White Dallas police officer.[20]

The habeas court and even the State[21] agree that the trial judge harbored actual bias against Applicant for being Jewish. Both agree, that Halprin is entitled to a new trial in

---

(2C RR 113-14) Judge Cunningham's own mother believed that her son's "bigotry and racism is his greatest burden, and it will cause his ruination." (2C RR 68).

[17] When asked what he was up to by close relatives, it was typical for Judge Cunningham to reply: "locking n#gg#rs up" or "TND" which stood for "typical n#gg#r deal." (2C RR 24, 113-14); *see also* (2B RR 58-60) (discussing Cunningham's regular use of the "'N' word" in non-public conversations).

[18] (2C RR 117).

[19] Cunningham referred to Catholics as "idol-worshippers" and "deviants." (2C RR 117; 2 Supp. Exh. 7-8).

[20] (3 RR 104; 2C RR 68-69, 124-26). "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias."'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 881 (2009)); *see also Rippo v. Baker*, 580 U.S. 285, 287 (2017) ("Recusal is required when, objectively speaking, 'the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable.'" (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Here, the record demonstrates that Judge Cunningham far exceeded the objective test looking for the mere "potential" for bias.

[21] *See* (10-03-2022 Supp. CR. 256) (State's Proposed Findings) ("Applicant's evidence at the writ hearing supports the inference that Judge Cunningham's state of mind at the time of trial overcomes the presumption "that the trial court was neutral, detached, and unbiased in all phases of the trial." *Carson v. State*, 515 S.W.3d 372, 378-79 (Tex. App.—Texarkana 2017), *rev 'don other grounds*, 559 S.W.3d 489 (Tex. Crim. App. 2018); *see also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986). Applicant's writ hearing evidence establishes by a preponderance of the evidence the structural error of actual judicial bias.").

front of an impartial judge. As the State asserted in their proposed findings to the habeas court:

> Standing alone, Cunningham's actual bias violates the Due Process Clause and renders irrelevant whether Applicant received an objectively fair trial. Such a violation of the right to a fair and impartial tribunal constitutes a structural defect affecting the framework within which the trial proceeds, which defies harmless error analysis.[22]

## II.    Discussion

*The Due Process Clause*

The Constitution prohibits the government from unfairly or arbitrarily depriving a person of "life, liberty, or property without *due process of law*."[23] Its importance to the Constitution is emphasized by the fact that it is required more than once in the Constitution's very text. First, it is required of the federal government in the Fifth Amendment of the Bill of Rights. Then, the Due Process Clause of the Fourteenth Amendment explicitly requires it from the States. And finally, the Fourteenth Amendment incorporates these due process rights from the Fifth Amendment and applies them against the States. And at its heart, it promises every criminal defendant a "fair trial" though not always a perfect one.[24]

---

[22] (10-03-2022 Supp. CR. 237) (State's Proposed Findings) (internal quotes and citation omitted).

[23] U.S. CONST., amend V, XIV.

[24] "As we have repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Rose v. Clark*, 478 U.S. 570, 579 (1986).

Yet, "[f]or all its consequence, 'due process' has never been, and perhaps can never be, precisely defined."[25] "Due process is not a mechanical device. It is not a yardstick."[26] That "feeling of just treatment" "cannot be imprisoned within the treacherous limits of any formula."[27] Nor is it a "technical conception with a fixed content unrelated to time, place and circumstances."[28] "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."[29]

Rather, "it is a delicate process of adjustment inescapably involving the *exercise of judgment by those whom the Constitution entrusted* with the unfolding of the process."[30] "[T]he phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty."[31] Accordingly, application of the Due Process Clause is "an uncertain enterprise which must discover what 'fundamental

---

[25] *Lassiter v. Dept. of Soc. Serv. of Durham Cty.*, 452 U.S. 18, 24 (1981).

[26] *Joint Anti-Fascist Ref. Comm. v. McGrath*, 341 U.S. 123, 163 (1951) (Frankfurter, J., concurring).

[27] *Id.*

[28] *Lassiter*, 452 U.S. at 24.

[29] *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961).

[30] *McGrath*, 341 U.S. at 163 (Frankfurter, J., concurring) (emphasis added).

[31] *Lassiter*, 452 U.S. at 24; *see Gideon v. Wainwright*, 372 U.S. 335, 339 (1963) ("Asserted denial (of due process) is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such a denial.").

fairness' consists of in a particular situation . . . ."[32] And this idea of "fundamental fairness" is perhaps best expressed in the words carved into stone at the Supreme Court building in our nation's capital: "Equal Justice Under Law."

Thus, under our constitutional scheme, the Due Process Clause requires the trial judge to be impartial, neutral, and detached because "[d]ue process guarantees 'an absence of actual bias' on the part of a judge."[33] Not only does the "process" of fundamental fairness require it, our constitutional scheme entrusts *only impartial judges* with the authority to "exercise their judgment" in the "unfolding of the process."[34] This is especially the case in a criminal trial where the government seeks to deprive a defendant of something so fundamental such as a person's Life—as in this case.[35] Fundamental fairness demands that the defendant is able to "present his case with assurance that the arbiter is not predisposed to find against him."[36]

---

[32] *Lassiter*, 452 U.S. at 24-25.

[33] *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009); *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "[A] 'fair trial in a fair tribunal is a basic requirement of due process.'" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

[34] *McGrath*, 341 U.S. at 163 (Frankfurter, J., concurring).

[35] "Because 'the imposition of death by public authority is . . . profoundly different from all other penalties,' 'the [Supreme] Court has been particularly sensitive to ensure that every safeguard is observed.' In no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d 224, 239 (D.C. Cir. 2019) (first quoting *Lockett v. Ohio*, 438 U.S. 5862, 605 (1978) (plurality); and then quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality)).

[36] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

Hence, when the judge presiding over a trial is found to be actually biased, the violation is structural in nature.[37] First, the defendant is denied a "jealously guarded" constitutional right and requirement.[38] Second, the confidence in the fundamental fairness of the trial is forever stained with doubt—especially if an execution has been carried out. This is because the biased judge may have made numerous exercises of discretionary authority to produce rulings, all based on "erroneous or distorted conceptions of the facts or the law."[39] Like other structural errors, a defect in the judge presiding over the matter affects the framework so as to defy our ability to identify, analyze, and isolate the harm.[40]

A fundamentally fair process does not and should not distinguish where the demonstration of bias comes from so long as it is a credible one—especially in a case such as this. Whether a judge is biased or not does not change based on whether the judge spoke his virulent antisemitic or racist remarks inside the courtroom in front of the jury.[41] The

---

[37] *Neder v. United States*, 527 U.S. 1, 9 (1999); *see Liteky*, 510 U.S. 540, 555 (1994) (finding actual bias to exist when a judge possesses "such a high degree of favoritism or antagonism as to make fair judgment impossible.").

[38] *Marshall*, 446 U.S. at 242.

[39] *Id*. "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997).

[40] *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) ("Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal conviction may be regarded as fundamentally fair." (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

[41] Any "possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Caperton*, 556 U.S. at 878 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

remarks, not where they were said or who heard them, is what matters. It is the antisemitic racist attitude and statements themselves that demonstrate the fact that the judge harbored actual bias against the defendant. Requiring the bias to be demonstrated within the confines of the trial record would effectively create a harm-analysis for something that, by its nature, defies analysis.[42] We would risk tolerating a Roland Freisler (President of the Third Reich's "People's Court") presiding over the case of a Jewish defendant so long as Freisler keeps his virulent antisemitism to himself. As the Supreme Court warns us about racism, "Some toxins [are] deadly in small doses."[43]

Neither should a fundamentally fair process be tethered too strictly to previous precedent nor demand hypertechnical requirements. Judicial minimalism for the sake of itself transforms the Due Process Clause into something unfair.[44] And as our Supreme Court precedent suggests, doing so would be imprisoning Due Process within the

---

[42] "Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argue before an impartial judge and jury." *Rose v. Clark*, 478 U.S. 570, 578 (1986).

[43] *Buck v. Davis*, 580 U.S. 100, 122 (2017). Because the vileness of the statements is not exaggerated, the moral outrage is not hyperbolic.

[44] Although the Supreme Court has found recusal to be constitutionally required in several specific scenarios, that does not mean those are all the scenarios where recusal is required. Especially in cases where a violation is so outrageous so as to shock the conscience, focusing too much on hypertechnicality generally fails to fulfill what the Rule of Law seeks to promote.

"treacherous limits" of a formula and defining that which "can never be precisely defined."[45] Common sense is required.

It is commonsensical that no reasonable person would be willing to be judged by a person who harbored a public and vigorous hatred based solely on his protected class.[46] No reasonable person could trust that the outcome of such an adjudication would be fair and just—even at the guarantee that the judge stayed within his discretionary authority. Finally, if one were to tell them that their very life was to be left in the hands of such a hateful person, no reasonable person would accept such an offer. And these answers would not be a surprise to anyone because a simple commonsense notion of fundamental fairness tells us that such a trial would not be fair, nor would it fulfill the Supreme Court's motto. Thus, if a reasonable person cannot "entrust" a judge biased against that person's protected class to administer a fair trial over him, why would the Constitution?[47] "[J]ustice must satisfy the appearance of justice."[48]

## IV.    Conclusion

---

[45] *McGrath*, 341 U.S. at 163 (Frankfurter, J., concurring); *Lassiter*, 452 U.S. at 24.

[46] "[E]xperience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47.

[47] *See McGrath*, 341 U.S. at 163 (Frankfurter, J., concurring).

[48] *Offut v. United States*, 348 U.S. 11, 13 (1954). "Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent *even the probability of unfairness*." *Withrow*, 421 U.S. at 47 (emphasis added; internal citations omitted).

This is not a case in which the action of a trial judge may just "look bad." This is not a case in which there is merely the "appearance of impropriety." This is a case where a person's lifelong hatred and prejudice against Jews made him unfit to preside over this case. And that toxic viewpoint runs counter to our concept of the Rule of Law because "[o]ur law punishes people for what they do, not who they are."[49]

Thus, no precedent, rule, technicality, or excuse can justify allowing such a demonstrably biased person to constitutionally stand in judgment over a member of a class of people the judge espouses to hate. It violates our fundamental sense of fair play and the Supreme Court's motto "Equal Justice Under Law" beneath which our precedent arises. For the temptation of a momentary convenience, it betrays that to which we bear allegiance.[50] To allow otherwise would essentially enable members of the judiciary—those persons we envision to be enlightened by reason and a deep knowledge of the law—to give justice for only some favored few but not for all.[51]

Filed: November 6, 2024.

Publish

---

[49] *Buck*, 580 U.S. at 123.

[50] "I, _____, do solemnly swear (or affirm), that I will faithfully execute the duties of the office of _____ of the State of Texas, and will to the best of my ability *preserve, protect, and defend the Constitution* and laws of the United States and of this State, so help me God."

TEX. CONST. art. 16, § 1 (emphasis added) (requiring all elected and appointed officials to swear or affirm the above "Official Oath of Office").

[51] *See Pledge of Allegiance*, 4 U.S.C. 4 (". . . with liberty and justice for all.").

**EXHIBIT 1**

While serving as a lawyer and a judge:

- "Godd#mn Jews"[52]
- "Filthy Jews"[53]
- "F##king Jew"[54]
- "K#ke"[55]
- "Godd#mn k#ke"[56]

After being appointed as presiding judge over the Texas Seven:

- "Because I'm going to get them all the death penalty, even the driver because he's guilty."[57]

While the Texas Seven trials were ongoing:

- "[T]he Mexican, the qu##r[,] and the Jew."[58]
- "[T]he god#mn k#ke."[59]

After Halprin's trial at a Super Bowl party:

---

[52] (2C RR 58, 59-60).

[53] *Id.*

[54] *Id.*

[55] (2C RR 60).

[56] *Id.*

[57] (2B RR 64).

[58] (2C RR 24); *see also* (2C RR 62-63).

[59] (2C RR 60).

16

- "Everyone of them knew when they stepped foot in my courtroom, from the Jew to the w#tb#ck, they were going down, that it was his sandbox and his playground and they all knew it."[60]

- "[A] n#gg#r, w#tb#cks[,] . . . and a Jew" (Describing the Texas Seven)

- Dressing up for the casino-themed event and claiming to look like "the greedy Jew banker for the day."

After the trial:

- That the State appointed him to get convictions, and he got the convictions.

- That he had to "save Dallas County from the n#gg#rs and the w#tb#cks and the Jews, … [as well as] red heads." (While campaigning for Dallas District Attorney).[61]

- He would gleefully say, "well, look at this, you know, greedy or filthy Jew writing me a check." (When he received a campaign contribution from a Jewish donor).[62]

- "the scum of the earth;" "pieces of sh#t;" "w#tb#cks;" "sp#cks;" "white n#gg#rs." (How he referred to the Texas Seven)[63]

- "Randy the Jew" and "the Jew Halprin" (How he referred to Applicant)[64]

- "Barry the Jew"; "the Jew Scheck"; "filthy Jew"; "lying Jew"; "greedy Jew" (Referring to Barry Scheck of the Innocence Project).[65]

---

[60] (2C RR 61).

[61] (2C RR 65).

[62] (2C RR 111-12).

[63] (2C RR 111).

[64] (2C RR 110-11).

[65] (2C RR 112).